STATE of North Dakota, Plaintiff
and Appellee

v.

Lorne MONSON, Defendant
and Appellant.

Cr. Nos. 930203 and 930380.

Supreme Court of North Dakota.

June 15, 1994.

Jonathan T. Garaas of Garaas Law Firm, Fargo, for defendant and appellant.

David D. Hagler, Asst. State's Atty., Fargo, for plaintiff and appellee.

LEVINE, Justice.

Lorne Monson appeals from the trial court's orders revoking his probation and continuing his probation for an additional two years. Because we conclude that the trial court's finding that Monson violated a condition of his probation is clearly erroneous, we reverse.

Monson pleaded guilty in April 1989 to charges of gross sexual imposition and corruption of a minor. He was sentenced to two and a half years in prison and two and a half years of supervised probation. One of the conditions of his probation was that Monson "shall have no contact in any form with the victim.... This includes personal contact, as well as telephonic and mail communica-

tions." On May 24, 1993, the State Probation and Parole Officer filed a petition for revocation of Monson's parole, alleging that Monson had violated the no-contact condition by attending several home and away basketball games of the victim's college team in 1992 and 1993. At the hearing on June 11, 1993, Monson objected to the proceedings as being beyond the jurisdiction of the court because Monson's probation had terminated on June 6, 1993. The trial court overruled the objection and determined that Monson's actions violated the no-contact condition. It issued an order revoking Monson's probation and placing Monson on an interim term of probation for ninety days, during which Monson was to receive a psychological evaluation. On November 9, over Monson's objection that his interim parole had terminated on September 4, 1993, the trial court sentenced Monson to two years of supervised probation with additional conditions. Monson appeals from the trial court's June 11 and November 9 orders. The appeals were consolidated.

On appeal, Monson argues that the trial court did not have jurisdiction after the termination of Monson's probation and that the trial court's finding that Monson had contact with the victim was clearly erroneous.

Monson first challenges the trial court's jurisdiction to revoke his probation or sentence him after his probation had terminated. He argues that application of the current version of NDCC § 12.1–32–07, in effect at the time of the alleged probation violation but not at the time of the original sentencing, is ex post facto.

Section 12.1–32–07 currently says, and at the time of the alleged probation violation said, in part:

"7. The court may continue or modify probation conditions or revoke probation for a violation of probation conditions occurring before the expiration or termination of the period of probation notwithstanding that the order of the court is imposed after the expiration or termination has occurred. The petition for revocation must be issued within sixty days of the expiration or termination of probation." NDCC § 12.1–32–07(7) (Supp.1993).

Previously, and at the time of Monson's original sentencing, section 12.1–32–07 said in part:

"4. The court may, upon notice to the probationer, modify or enlarge the conditions of a sentence to probation at any time prior to the expiration or termination of the period for which the sentence remains conditional. If the defendant violates a condition at any time prior to the expiration or termination of the period, the court may continue him on the existing sentence, with or without modifying or enlarging the conditions, or if such continuation, modification, or enlargement is not appropriate, may impose any other sentence that was available under section 12.1–32–02 or 12.1–32–09 at the time of initial sentencing." NDCC § 12.1–32–07(4) (1985).

Monson argues that the old statute applies, and thus the trial court was without jurisdiction to revoke his probation after it terminated. The State answers with two arguments: first, that the application of the current statute is not ex post facto because the statute applies to Monson's alleged violation, not his conviction; and second, that even under the old statute, the trial court could revoke probation after termination as long as it acted with reasonable promptness. We find the State's arguments persuasive.

■■■■ To be ex post facto, a criminal law "must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Weaver v. Graham*, 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981) (footnotes omitted); *see also State v. Jensen*, 333 N.W.2d 686, 693–94 (N.D.1983). In *In re Williams*, 488 N.W.2d 667 (S.D.1992), the South Dakota Supreme Court held that a 1986 provision of a statute regarding suspension of parole supervision time was not ex post facto because it was applied not to the defendant's 1981 conviction but to his 1987 parole violation. We agree with the court's reasoning. Here, the current statute, which expressly grants authority to the trial court to revoke probation after the probation has terminated, is not being applied to Monson's

conviction, but to his alleged probation violation. It is his acts subsequent to the amendment of the statute that are at issue. *See also, e.g., In re Nolasco,* 181 Cal.App.3d 39, 226 Cal.Rptr. 65 (Ct.App.1986) [holding that extension of parole revocation terms for acts which occurred after effective date of statute subjecting parolee to additional penalties for misconduct in prison was not ex post facto]; *Gasper v. Gunter,* 851 P.2d 912 (Colo.1993) [holding that application of statute revoking parole time credit was not ex post facto where application was triggered by defendant's acts committed after statute became effective].

Even under the old statute, our caselaw gave trial courts authority to revoke probation after termination, as long as the court acted with reasonable promptness. In *State v. Nelson,* 417 N.W.2d 814, 815–16 (N.D. 1987), Nelson's probation terminated on March 3, 1987, but the State did not initiate revocation proceedings until March 6, and the court did not issue the revocation order until March 20. We held that the court had jurisdiction to revoke Nelson's probation because it had acted with "reasonable promptness." *Id.* at 816 (quoting *Decker v. State,* 209 N.W.2d 879, 885 (N.D.1973)). Similarly, in *State v. Chapin,* 429 N.W.2d 16, 18 (N.D.Ct.App.1988), the court held that the trial court had acted with reasonable promptness in issuing a revocation order twenty days after termination of Chapin's probation, and thus had jurisdiction to revoke the probation.

Monson argues that *Nelson* and *Chapin* are bad law because they rely on *Decker v. State,* 209 N.W.2d 879 (N.D.1973), which involved a statute that has since been repealed. We believe that the analysis of the cases is independent of the repealed statute and thus we are not persuaded by Monson's argument. We conclude that the trial court had jurisdiction to revoke Monson's probation on June 11, 1993, and to sentence Monson to two years of supervised probation on November 9, 1993.

Although the trial court had jurisdiction to revoke Monson's probation, we believe that

its finding that Monson's actions violated the no-contact condition was clearly erroneous, and therefore the revocation and sentence were abuses of the court's discretion.

■ We review a probation revocation in two steps. First, we review the trial court's factual determination that the defendant violated the terms of his probation under a clearly erroneous standard. Second, we review the trial court's determination that the violation warrants revocation under an abuse of discretion standard. *State v. Saavedra,* 406 N.W.2d 667, 669 (N.D.1987).

The no-contact condition of Monson's probation provided that Monson "shall have no contact in any form with the victim.... This includes personal contact, as well as telephonic and mail communications." The State argues, and the trial court found, that Monson violated the no-contact condition by attending six of the victim's college basketball games over a four-month period.

■ We strictly construe conditions of probation in favor of the defendant. *State v. Drader,* 432 N.W.2d 553, 554 (N.D.1988). Therefore, if conditions of probation are capable of two constructions, we will construe the conditions in favor of the defendant. *Id.* at 554; *see also Hughes v. Powers,* 453 N.W.2d 608, 610 (N.D.1990). In *Drader,* we noted that "[t]here is great value in making all conditions of release clear and capable of being understood by the offender in order that he knows exactly what is expected of him." *Drader, supra* at 554 n. 4. When the conditions of probation proscribe acts that are not criminal,[1] "due process requires that the probationer receive actual notice" that his acts could lead to revocation. *Drader, supra* at 555 (quoting *United States v. Simmons,* 812 F.2d 561, 565 (9th Cir.1987)).

■ The dictionary defines "contact" in this context as "[t]he coming together or touching of two objects" or "[t]he state of being in communication." American Heritage Dictionary 315 (2d College ed. 1985). Here, the victim testified:

---

1. Monson's attendance at the victim's basketball games occurred before North Dakota's stalking law became effective. *See* NDCC § 12.1–17–07.1, effective April 2, 1993.

"Q ... [D]id you ever to your knowledge have eye contact with [Monson]?

"A No.

"Q Okay. Did you ever have any oral communication with him?

"A No.

"Q Any written communication with him?

"A No.

"Q Either from you or to you from him?

"A No.

"Q Okay. So the extent of the—his presence was just that; that he was present at those games; is that right?

"A Yes."

Monson argues that his presence at the basketball games was not "contact," giving that term its ordinary meaning. The trial court, however, characterized Monson's presence at the games as communication:

"This is a pattern of deliberate activity planned knowingly by the Defendant in advance. And the geography, if nothing else, shows to me that he intended to intimidate [the victim]. He knew exactly where he was going. He planned to do it. He admitted doing it. But he insists he had no contact. He had contact. He intended to and did communicate something to [the victim]. If nothing else, intimidation. Touching is not required to communicate. Eye contact is not required to communicate. A pattern of being there in my opinion is an attempt to and a successful attempt to communicate intimidation to the victim."

Although the trial court's construction is reasonable and we might agree that Monson's presence at the games did, and perhaps was intended to, intimidate the victim, we must construe the no-contact condition strictly, namely, in Monson's favor. *Drader, supra* at 554–55. Nowhere in the record do we find instructions to Monson that "no contact" means that he could not be in the same place as the victim. Instead, he was directed not to have any contact with her, "includ[ing] personal contact, as well as telephonic and mail communications." He did not touch her, he did not speak to her, he did not phone her, he did not write her a letter. No effort was made to amend the conditions of Monson's probation to prohibit his attendance at the games. Indeed, when Monson asked his probation officer about the propriety of attending the same church as the victim, he was told that it would not violate the no-contact condition. Without more specific instructions to Monson, Monson's belief that he could attend the victim's basketball games was not unreasonable under the circumstances. Therefore, we must construe the no-contact condition in favor of Monson and according to the ordinary meaning of "contact," to touch or to communicate. We conclude that the evidence does not support a finding that Monson did either by being present at the games. Therefore, the trial court's finding that Monson violated the no-contact condition was clearly erroneous. We reverse its orders revoking Monson's probation and sentencing him to two years of supervised probation.

Reversed.

VANDE WALLE, C.J., and NEUMANN, SANDSTROM and MESCHKE, JJ.